UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Woody Borgella,　　　*Petitioner*,　　– against –　Earl Bell,　　　*Respondent*. | 1:18-CV-2026　　**Not for Publication**　　**Opinion & Order** |

ROSS, United States District Judge:

This habeas petition presents the question whether evidence erroneously admitted at trial deprived petitioner of his due-process right to a fair trial. After a careful review of the record, I conclude that the impact of the improper evidence on the trial was minimal and did not deprive petitioner of his constitutional rights. Accordingly, I deny the petition.

## BACKGROUND

On March 12, 2014, after a jury trial in New York Supreme Court, Kings County, petitioner, Woody Borgella, was convicted of second-degree murder and of second-degree criminal possession of a weapon. *See* Trial Tr. 431:17–432:12, ECF No. 8-2. At trial, there was no question that Borgella had shot and killed the victim, Laura Ann Evans (*see, e.g.*, *id.* at 301:8–13); rather, the principal issues for the jury centered on Borgella's intent (*see id.* at 408:18–411:18) and whether the killing was justified as an act of self-defense (*see id.* at 411:24–412:9). At trial, evidence prejudicial to Borgella was improperly admitted. I recount below both the improperly admitted evidence and the principal evidence that led to Borgella's conviction.

*Pretrial Proceedings*

Prior to trial, the prosecutor sought a ruling from the trial court that if Borgella testified in his defense, she would be permitted to elicit testimony regarding three matters. *See* Pretrial Hr'g Tr. 35:5–37:25, ECF No. 8-1. Specifically, she sought permission to elicit: (1) "[t]hat two years prior to this incident, [Borgella] fired off a gun out in the street in front of [his] apartment building" because "[h]e got angry at a party at a man" (*id.* at 35:15–19); (2) "that three days before the homicide . . . the defendant got into a fight with the victim and he punched her" and "[l]ater that evening . . . posted on his [Facebook] wall, I smell murder in the wind" (*id.* at 36:19–23); and (3) "that the defendant is a former member of the Bloods gang" (*id.* at 37:1–2).

The next day, the trial judge ruled on her application. First, he stated that he "wouldn't allow any questioning about [Borgella] fir[ing] off a gun in front of a building" but permitted her to renew this application after Borgella's direct testimony if she considered it warranted. Voir Dire Tr. 6:10–7:11, ECF No. 8-2. Second, he ruled that if Borgella took the stand, she would be permitted to inquire on cross-examination into the alleged fight with Evans and subsequent Facebook posting. *See id.* at 7:13–9:7; *see also id.* at 83:19–84:13 (clarifying ruling). Third, the judge precluded cross-examination concerning Borgella's "prior membership in the Bloods" unless, after Borgella's direct examination, the prosecutor persuaded the court that the probative value of this evidence outweighed its prejudicial effect. *Id.* at 9:23–10:1.

*The State's Case at Trial*

The prosecution's three chief witnesses were all personal acquaintances of Borgella who were nearby when Evans was killed.

The first, Andre Lee Jr., had been a friend of Borgella since they were teenagers. *See* Trial Tr. 26:10–17; *id.* at 40:2–6. Lee testified as follows: On the day that Evans was killed,

Lee, then sitting on a couch in the living room of Borgella's Brooklyn apartment, heard Evans scream from Borgella's bedroom that she "got gun butted." *Id.* at 28:9–29:9.[1] When Lee then entered Borgella's bedroom, he saw Evans jumping on the bed and Borgella standing beside the bed. *Id.* at 29:10–30:3. He then observed Evans swing an approximately sixteen- or seventeen-inch-long knife at Borgella, who was wearing a shirt and a jacket. *Id.* at 29:10–29:18, 41:13–42:22.[2] When Lee witnessed this, Borgella was standing within two or three feet from Evans. *Id.* at 42:16–18, 45:10–12. At no time did Lee see the knife Evans wielded make contact with Borgella. *Id.* at 29:24–30:1, 42:19–20. Immediately thereafter, Borgella pulled out a gun, said "fuck it," and shot Evans. *Id.* at 29:14–30:5.

On cross-examination, defense counsel asked Lee to describe Borgella's "personality." *Id.* at 40:7–8. Lee responded that Borgella was "mellow." *Id.* at 40:9. Defense counsel also asked whether Borgella "scream[s] a lot, yell[s] a lot, hit[s] people a lot," to which Lee replied, "No." *Id.* at 40:10–11. At the close of Lee's cross-examination, the prosecutor requested a sidebar, which was conducted off the record. *Id.* at 46:20–47:2.

On redirect, after reminding Lee that he had "just [been] asked some questions about what [he] knew about Woody, how he behaved, he was mellow and nonviolent," the prosecutor asked Lee whether he was "aware if Woody was involved in any group at some point in his life that engaged in violent activity." *Id.* at 47:5–12. Lee responded: "The last time there was a fight, a Mayweather fight." *Id.* at 47:13. The trial judge then interceded: "I don't think she was asking you about that. I don't think that answers the question. . . . She's asking you about the defendant, whether or not he was involved with any group that may have been

---

[1] Lee clarified on cross-examination that this meant that she "got hit with a gun over the head." Trial Tr. 43:19–22.

[2] An officer who responded to the crime scene would later testify that he recovered a knife from the floor in Borgella's bedroom that was fifteen-and-a-half inches long with a ten-inch blade. *Id.* at 209:24–210:15.

3

involved in violent activity." *Id.* at 47:20–48:1. Lee answered that he was not aware of any such involvement. *Id.* at 48:2–7.

The state's next witness was Bohammond Lee, Andre Lee's brother. *See id.* at 56:16–21. Bohammond Lee, who had known Borgella for approximately twenty years, testified on direct examination that, for approximately one year when Borgella was a teenager, Borgella associated with the Bloods gang. *Id.* at 51:17–18, 61:17–63:1.[3]

The state's third witness was the Lees' cousin, La-Ron Gaskin, who had known Borgella for about ten years. *Id.* at 77:22–79:1, 84:14–15. He testified on direct examination that he had a "very good" relationship with Borgella, and that Borgella was "an educated, professional, family person." *Id.* at 79:9–11. Gaskin, who was seated on the couch with Andre Lee on the day that Evans was killed, related that he heard an argument between Borgella and Evans emanating from Borgella's room during which Evans said, "you want to hit me with a gun." *Id.* at 82:7–84:3. Gaskin also corroborated Andre Lee's testimony that Lee got up from the couch and entered Borgella's room before the fatal shot was fired. *See id.* at 84:4–23.

The prosecutor then directed Gaskin's attention to "a party . . . on the night of the Mayweather fight" that occurred "two years prior to [Evans]'s death." *Id.* at 85:19–23. The prosecutor asked Gaskin about Borgella engaging in "an argument with someone at the party," which prompted an objection from defense counsel and another off-the-record sidebar. *Id.* at 86:7–17. Thereafter, having reminded Gaskin that he had earlier testified to his "good relationship" with Borgella, the prosecutor asked Gaskin whether he "ever kn[e]w of an incident where [Borgella] engaged in an act of violence." *Id.* at 86:18–24. Her inquiries ultimately elicited from Gaskin that, at a Mayweather fight party, he had witnessed Borgella and another man get into a "heated argument" that "spilled outside." *Id.* at 87:12–88:8.

---

[3] Although Bohammond Lee was present in the apartment when Evans was killed, he was asleep at the time. *See id.* at 58:6–11.

4

At the close of Gaskin's testimony, after dismissing the jury, the judge explained on the record that, "at the side-bar,"[4] because of the "testimony regarding the defendant's character, his reputation for peacefulness and his being just a nice guy," the prosecutor was permitted to elicit testimony about the fight at the party by inquiring "whether or not during this period of time when [the witness] felt the defendant was a peaceful guy . . . he ever observed [the defendant] engage in any violent acts." *Id.* at 101:22–102:8.

The state also introduced previous statements that Borgella had made to the police. The police officer who interviewed Borgella after he turned himself in testified that Borgella initially claimed that Bohammond Lee had killed Evans. *Id.* at 116:24–117:10, 123:12–17. After the police told Borgella that they had an eyewitness, he then changed his story, admitting that he was the one who shot Evans, but only after Evans threatened him with a knife. *Id.* at 123:18–124:25. Additionally, Borgella gave a written statement setting out that after Evans "got violent and grabbed a knife sitting on [his] window sill," he "went for [his] 25 handgun caliber with the intention to scare her, but she swung the knife at [his] wrist which resulted in [his] getting injured." *Id.* at 125:6–10, 127:6–10. It was then, Borgella wrote, that he "shot her once in the chest." *Id.* at 127:11–14. Further, Borgella made a statement to an assistant district attorney, which was videotaped. *See id.* at 127:19–25. In that statement, which is not itself in the record before me, Borgella stated that, when he shot Evans, he was angry because she had cut him. *See id.* at 325:12–18.

Finally, the state offered the testimony of another officer, who was qualified as a firearms expert. *See id.* at 170:13–20. The expert, who had analyzed the gun that was used to kill Evans, testified that the gun required the force of "a firm handshake" to pull the trigger.

---

[4] It is not clear from the record whether the trial judge was referring to the sidebar taken during Andre Lee's testimony, the sidebar taken during Gaskin's testimony, or both. *See also* Appellant Br. 4, ECF No. 8-3 (Ex. I) ("After defense counsel elicited from a prosecution witness that appellant had a 'mellow' 'personality,' the court ruled the door was opened to questioning about the precluded allegations.").

5

*Id.* at 185:13–19. Specifically, he testified that the gun in question required six-and-a-half pounds of pressure to fire. *Id.* at 185:2–4. He described this as an "average" amount and contrasted it with a "hair trigger," which might require only "one to two" pounds of pressure. *Id.* at 186:23–187:3, 192:7–13.

*The Defense Case at Trial*

Borgella testified in his defense. He related that, when Andre Lee came into his bedroom, Evans was swinging a knife at Borgella, and she cut his wrist with the knife. *Id.* at 294:3–296:8. Borgella testified that he had originally grabbed the gun from his closet "to scare her," not "to shoot her." *Id.* at 327:17–18. But in the end he shot Evans because he was "scared for [his] life. [He] didn't really mean to kill her. [He] didn't want to kill her." *Id.* at 301:11–13. Due to the small size of the room, he believed that he "couldn't turn [his] back because [he] d[id]n't know if she was going to stab [him] or anything like that" and he "didn't want to take any chances." *Id.* at 301:14–20. As a result, he "really thought [his] life was in danger." *Id.* at 305:3–10. He insisted that he feared for his life when he shot Evans and denied being angry at her. *See id.* at 325:19–23. In the following exchange, Borgella concluded his testimony by emphasizing that the shooting was accidental and was done in self-defense:

Q   So the whole incident is a result of accidentally discharging one shot after you were cut on the arm with that knife; is that correct?

A   Yes.

Q   To save your own life; correct?

A   Yes.

*Id.* at 309:13–18.

On cross-examination, the prosecutor asked Borgella about his alleged prior bad acts. He denied being involved with the Bloods. *See id.* at 311:24–312:7, 337:22–338:13. He also denied having a physical fight with Evans two days before her death and posting "I smell

6

murder when the wind blows" on his Facebook page. *Id.* at 316:15–317:14.[5] Although he admitted having an argument with someone at a Mayweather fight party two years before Evans's death, he denied either fighting with the man or firing a gun during the incident. *Id.* at 330:19–332:7, 337:8–9.

*Summations and Verdict*

At the close of trial, the judge ruled that the prosecutor could reference the Facebook posting in her summation but that "it would not be fair to say that the defendant ever previously fired a gun at a boxing party" as there was "no evidence of that." *Id.* at 342:23–343:16. In the end, the prosecutor made no mention in her summation of the alleged shooting at the Mayweather fight party, the Facebook posting, or the alleged fight between Borgella and Evans. But she did, in response to defense counsel's portrayal of Borgella "as a nonviolent individual," refer to Bohammond Lee's testimony that Borgella "was involved with the Bloods." *Id.* at 397:24–398:5.

The prosecutor opened her summation by arguing that the testimony of Andre Lee and Gaskin—that they had heard statements indicating that Borgella had first hit Evans with a gun—demonstrated that "the defendant was the initial aggressor here." *Id.* at 385:2–18.[6] She also reminded the jury that Andre Lee testified that the knife wielded by Evans "never made contact with the defendant" and that "the defendant was wearing a jacket," which "mean[t] that his arms were covered." *Id.* at 387:16–388:8.

She proceeded to argue that Borgella's testimony was not worthy of belief because he had offered "so many different stories as to what happened." *Id.* at 389:25–390:2. In this

---

[5] Borgella did not dispute that the message was posted; rather, he testified that he did not know who posted it, that multiple people had access to his Facebook account, and that he and his acquaintances had a habit of posting under each other's names on Facebook. *See* Trial Tr. 317:21–318:12.

[6] A finding that Borgella was the initial aggressor would have categorically ruled out the possibility of a justification defense. *See* N.Y. Penal Law § 35.15(1)(b), (2)(a)(i); *see also* Trial Tr. 413:23–415:4 (jury charge).

7

regard, she noted that Borgella first "blame[d] . . . Bohammond" for the killing before "saying Laura Ann Evans cut him[,] [s]o he had to shoot her in self-defense." *Id.* at 390:14–23. She also related that Borgella stated to police that he was enraged at the time of the shooting but at trial "once again . . . change[d] his story," claiming that "he was scared." *Id.* at 391:6–18. Finally, she observed that Borgella originally "sa[id] nothing about [the shooting] being . . . accident[al]," in contrast to the substance of his trial testimony. *Id.* at 394:8–19. She bolstered this point by reference to Andre Lee's testimony, which suggested that the shooting "was an intentional act," and by reference to the expert testimony that the gun in question required "firm pressure to get it to go off." *Id.* at 394:20–396:4.

Once the jurors began deliberating, their only request was to review Borgella's "videotaped statement and [his] written statement." *Id.* at 429:22–430:5. After receiving those materials, the jury arrived at a unanimous verdict, finding Borgella guilty of both second-degree murder and second-degree criminal possession of a weapon. *Id.* at 430:6–7, 431:17–434:5.

*State Appellate Proceedings*

Petitioner appealed his conviction, arguing, *inter alia*, that "the court erred in admitting speculative and extremely prejudicial evidence that [he] had been associated with the Bloods years earlier, had a 'heated argument' with someone two years before the shooting, and posted a song lyric about murder three days earlier." Appellant Br. 27, ECF No. 8-3 (Ex. I). "These errors," he argued, "violated [his] due process right to a fair trial" under the federal and state constitutions. *Id.* at 28.

On November 23, 2016, the Appellate Division of the New York Supreme Court affirmed Borgella's conviction, though it agreed with him on a number of points. *See People v. Borgella*, 41 N.Y.S.3d 736 (App. Div. 2016). In particular, the appellate court ruled that "[t]he Supreme Court erred . . . in permitting the People to elicit testimony from the defendant

8

regarding a comment posted on his Facebook page, since the comment was not probative of the defendant's credibility." *Id.* at 737. The court also agreed that "[t]he Supreme Court further erred in permitting the People to elicit testimony . . . regarding the defendant's alleged gang affiliation and involvement in a prior violent incident" because "the defendant did not introduce evidence that could properly be construed as character evidence and, thus, it was improper to permit the People to elicit evidence as to the defendant's alleged prior bad acts on that basis." *Id.* And the Appellate Division ruled that the trial court's "modifi[cation]" of its pretrial ruling—"permitting the prosecutor to question the defendant regarding his alleged gang affiliation and the prior violent incident"—was "improper[ ]" because "the defendant did not 'open the door' to the otherwise precluded evidence." *Id.* "Nevertheless," the court concluded, "these errors were harmless, as there was overwhelming evidence of the defendant's guilt, and no significant probability that the errors contributed to his convictions. Moreover, the errors, considered [singly] and cumulatively, did not deprive the defendant of a fair trial." *Id.* (citations omitted).

Petitioner's application for leave to appeal this decision to the New York Court of Appeals was denied on March 23, 2017. *People v. Borgella*, 76 N.E.3d 1080 (N.Y. 2017).

*Current Proceeding*

Borgella, now acting pro se, filed a petition for a writ of habeas corpus in the U.S. District Court for the Northern District of New York, where he is incarcerated. *See* Pet., ECF No. 1. The petition was thereafter transferred to this district. *See* Order Transferring Case, ECF No. 2.

## STANDARD OF REVIEW

My review of the petition is governed by 28 U.S.C. § 2254. Under that statute, I may not grant a habeas petition as to "any claim that was adjudicated on the merits in State court

9

proceedings unless the adjudication of the claim" either: "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d).

> Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "In this analysis, a state court's 'unreasonable' application of law is not synonymous with an 'incorrect' or 'erroneous' decision. . . . Instead, the state court's application must be 'objectively unreasonable' . . . . Whether the state court's application is 'objectively unreasonable' depends, in part, on the specificity of the clearly established rule of law." *Jackson v. Conway*, 763 F.3d 115, 135 (2d Cir. 2014) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). That is, "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id.* (alterations in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Although the foregoing standard of review is exacting, the filings of a pro se petitioner are "held 'to less stringent standards than formal pleadings drafted by lawyers'" (*Castillo v. Walsh*, 443 F. Supp. 2d 557, 561 (S.D.N.Y. 2006) (quoting *Hughes v. Rowe*, 49 U.S. 5, 9 (1980))). I therefore read Borgella's submissions "liberally and interpret them to raise the strongest arguments that they suggest." *Id.* (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).

**DISCUSSION**

Borgella argues, as he did on his direct appeal, that the trial court's allowance of "witness testimony regarding the Petitioner's Facebook post stating 'I smell murder,' the Petitioner's alleged gang affiliation, [and] a prior violent incident involving a gun" "deprived [him] of due process under the Fourteenth Amendment." Traverse 2, 6, ECF No. 9. The state no longer contests that the evidentiary rulings were erroneous but argues that "none of the alleged evidentiary errors deprived defendant of due process, because the evidence of his guilt was overwhelming." State Br. 17, ECF No. 8. Ultimately, I conclude that, under the applicable standard, Borgella was not denied due process.

"Because the federal courts have no authority to review issues of state law, erroneous application of state evidentiary rules alone does not merit habeas relief." *Sims v. Stinson*, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000), *aff'd*, 8 F. App'x 14 (2d Cir. 2001). And "the harmlessness of an error of state law in a state prosecution is itself a matter of state law not subject to federal habeas review." *Freeman v. Kadien*, 684 F.3d 30, 34 (2d Cir. 2012). But if "the alleged errors are so prejudicial as to constitute fundamental unfairness"—thus implicating the defendant's due-process rights under the U.S. Constitution—then they are "subject to federal review." *Silva v. Keyser*, 271 F. Supp. 3d 527, 541 (S.D.N.Y. 2017) (quoting *McCray v. Artuz*, No. 93-CV-5757 (LBS), 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994)), *appeal dismissed*, No. 17-3324, 2018 WL 1831778 (2d Cir. Mar. 26, 2018).

To violate due process, the improper evidence must be "so extremely unfair that its admission violates fundamental conceptions of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012). In other words, the due-process question is "whether the erroneously admitted evidence, viewed objectively in light of the entire record

before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).

If a habeas petitioner makes out a constitutional violation, he is nevertheless entitled to the writ only if he can show that the error was not harmless—that is, "only when the constitutional violation 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ercole*, 644 F.3d 83, 93 (2d Cir. 2011) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). If the court "is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Wray v. Johnson*, 202 F.3d 515, 525 (2d Cir. 2000) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). Otherwise, the writ will issue. *See id.*

Where the petitioner alleges that he did not receive a fundamentally fair trial, however, that second analytical step is unnecessary. *See Dey v. Scully*, 952 F. Supp. 957, 974–75 (E.D.N.Y. 1997). "Since the fundamental fairness analysis . . . is more stringent than the harmless error standard . . . [,] a deprivation of fundamental fairness can never be harmless." *Id.* at 975.

Accordingly, the sole issue before me is whether the admission of the challenged evidence deprived Borgella of a fundamentally fair trial.

Here, the trial court's errors resulted in: (1) Bohammond Lee testifying that Borgella was involved with the Bloods as a teenager (*see* Trial Tr. 62:16–63:1)—and the prosecutor using that testimony to dispute defense counsel's argument that Borgella was a nonviolent person (*see id.* at 397:24–398:4); (2) the prosecutor asking Borgella about the posting of a reference to murder on his Facebook page two days before Evans's death and following an argument between the two of them (*see id.* at 316:15–317:9); and (3) the prosecutor asking

12

Borgella whether he had fired a gun at a man during a previous dispute (*see id.* at 331:21–25).[7] Considering that the sole issue in the case was whether Borgella had shot Evans in anger—as opposed to doing so in self-defense or by accident—I cannot say that placing evidence of Borgella's violence before the jury was not to some extent prejudicial.

"[I]n light of the entire record before the jury," however, I find that this evidence was not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins*, 755 F.2d at 19. The strongest evidence against Borgella was the testimony of Andre Lee, an eyewitness to the shooting, who testified that after Evans "swung a knife at" Borgella, Borgella "just said, fuck it, lifted up the gun and shot her." Trial Tr. 29:14–18. Borgella, for his part, denied that that is what happened (*see id.* at 328:8–10), but the defense never presented any reason why Lee—who testified that he had been Borgella's friend for years (*id.* at 26:10–17)—would lie. Additionally, Borgella's own inconsistent accounts of what happened, beginning with his attempt to blame Bohammond Lee for the killing (*see id.* at 123:12–17, 304:1–2),[8] gave the jury ample reason to disbelieve *him*.[9] And his insistence that the shooting was an accident (*see, e.g.*, *id.* at 307:4–12, 309:13–16) was significantly undermined by the unrebutted testimony of a firearms expert that the gun in question did not have a hair trigger but rather required substantial force to be fired (*see id.* at 185:13–19).

---

[7] Although Borgella answered these questions in the negative (*see supra* pp. 6–7) and the jury was instructed that "the questions the attorneys ask during the trial are not evidence" (Trial Tr. 5:15–22), the jury might nonetheless have inferred that the prosecutor had a basis to ask these questions (*see Michelson v. United States*, 335 U.S. 469, 481 n.18 (1948)).

[8] Although one might speculate that the Lees were upset by Borgella's attempt to shift the blame to Bohammond, no evidence of animosity between Borgella and either of the Lees was adduced at trial; indeed, it is not clear whether the Lees even knew what Borgella had originally told the police.

[9] The inference that Borgella's case was undermined by his own statements gains credence from the fact that the only evidence that the jury requested before reaching its verdict was his written and videotaped statements (*see supra* p. 8).

13

There was also evidence that Borgella was the initial aggressor, in that he may have hit Evans with the gun before Andre Lee entered the room. Both Andre Lee and Gaskin testified that Evans shouted that Borgella had, or would, hit her with a gun (*see id.* at 28:12–29:18, 83:20–84:3),[10] and at her autopsy, Evans was found to have a blunt injury beneath her scalp (*see id.* at 260:24–261:3, 263:4–264:3). Although the defense developed testimony that called the origin of Evans's injury into question (*see, e.g., id.* at 43:19–44:6), it failed to directly rebut the suggestion that Borgella had hit Evans with the gun. Notably, despite taking the stand, Borgella never testified that he did not hit Evans.

In light of all the evidence at trial, and after careful consideration, I conclude that the improperly admitted evidence, though prejudicial, was not so material that it deprived Borgella of a fundamentally fair trial.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because petitioner has not "made a substantial showing of the denial of a constitutional right" (28 U.S.C. § 2253(c)(2)), no certificate of appealability will issue, although petitioner may seek such a certificate from the Second Circuit. The Clerk of Court is directed to enter judgment accordingly and close the case.

So ordered.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: June 19, 2019
Brooklyn, New York

---

[10] No reason to disbelieve Andre Lee's and Gaskin's testimony on this point was ever suggested.

14